# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CHANG LIM,

    Plaintiff,

    v.

ALEX M. AZAR II,[1]
*Secretary, U.S. Department of*
*Health and Human Services,*
U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
SCOTT GOTTLIEB, *Commissioner,*
LUCIANA BORIO, *Chief Scientist,*
JAMES M. SIGG,
*Chief Operating Officer,* and
U.S. FOOD AND DRUG
ADMINISTRATION,

    Defendants.

Civil Action No. TDC-17-0438

## MEMORANDUM OPINION

Plaintiff Dr. Chang Lim, a former Commissioner's Fellow with the United States Food and Drug Administration ("FDA"), has filed this action against the Secretary of Health and Human Services ("the Secretary" or "HHS"), the United States Department of Health and Human Services, the FDA, and three FDA officials (collectively, "Defendants"), alleging that he was subjected to a hostile work environment and discrimination on the basis of race, color, and national origin, as well as unlawful retaliation for filing complaints with the FDA and the United States Equal Employment Opportunity Commission ("EEOC"), all in violation of Title VII of the

---

[1] Defendant Thomas E. Price is no longer the Secretary of Health and Human Services. The Clerk is directed to substitute the present Secretary as the Defendant in this case. *See* Fed. R. Civ. P. 25(d).

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (2012).  Presently pending before the Court are Defendants' Motion to Dismiss and Lim's Motion for Leave to File a Second Amended Complaint ("Motion to Amend").  Having reviewed the submitted materials, the Court finds that no hearing is necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, the Motion to Amend is GRANTED, and the Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.      Factual History

In October 2008, Dr. Chang Lim, an Asian American of South Korean descent, was selected as one of 50 FDA Commissioner's Fellows ("Fellows"), a program that allowed scientists such as Lim to work on specific research projects under the guidance of a senior FDA scientist, known as a "preceptor."  Second Am. Compl. ("SAC") ¶¶ 14, 16, ECF No. 68-2.  In the following months, Lim's relationship with his colleagues in the program deteriorated.  Another Fellow, Juandria Williams, asserted that Lim had sent a condescending email to the other Fellows as part of a proposal to start a study group with membership conditioned on a certain level of commitment.  On March 5, 2009, Lim received a memorandum from L'Tonya Davis, the Executive Officer in the FDA Office of the Commissioner, which set forth expectations for appropriate interactions with other FDA employees.  In response, on March 16, 2009, Lim submitted a 29-page "Internal Memorandum" accusing Williams and other Fellows of intentional infliction of emotional distress, negligence, fraudulent misrepresentation, professional misbehavior, extortion, and conspiracy based on emails sent during the discussions about the proposed study group and the selection of a representative to communicate information from

Fellows to the management of the Commissioner's Fellows Program. SAC ¶ 27; Internal Memo., J.R. 1205-33.[2] The FDA took no formal action in response to Lim's memo.

Beginning in December 2008, Lim's preceptor, Dr. Jonathan Sackner-Bernstein, required Lim to develop a research project independently. Between December 2008 and March 2009, Sackner-Bernstein provided various positive comments on Lim's research proposal, but none of his proposals were accepted. According to Lim, Sackner-Bernstein also prevented him from attending various mandatory classes.

Lim further alleges that, on March 15, 2009, Sackner-Bernstein learned from Kelly Wilkicki, the coordinator of the Commissioner's Fellows Program, that Lim is of Korean origin. By April 1, 2009, Sackner-Bernstein was expressing serious concerns about Lim. Dissatisfied with one of Lim's research proposals, Sackner-Bernstein wrote to Wilkicki and Nathan Dickey, an FDA Human Resources Specialist, "I don't think he sees the big picture that we need to craft a project and its proposal quickly." SAC ¶ 35. Sackner-Bernstein stated in a separate email to Wilkicki and Dickey that "I must conclude that [Lim] is unlikely to make great progress as a member of the Agency" and that Lim "doesn't understand scientific methods nor possess the interpersonal skills to work effectively/productively in a large or intense organizational structure." Sackner-Bernstein Email at 2, J.R. 1235. On April 2, 2009, Sackner-Bernstein wrote to Wilkicki and Dickey that, "If you were to decide it best for [Lim] to leave, I would not disagree." SAC ¶ 37. He added that Lim "does not appear to know what he does not know and does not understand where the limits should be for him in a group setting." SAC ¶ 31. On April 13, 2009, Sackner-Bernstein told Lim "[s]orry, I can't work with Korean like you." SAC ¶ 44.

---

[2] Lim attached several documents to both the First and Second Amended Complaints. The Court finds that these documents are integral to the complaint and will consider them when deciding the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

On April 15, 2009, Lim submitted a "Petition for Waiver" to Wilkicki requesting permission to begin his proposed research project without Sackner-Bernstein's approval. Wilkicki never responded to this request. From December 2008 to May 2009, Lim made repeated, unsuccessful requests that FDA allow him to change his preceptor. FDA, however, allowed at least four white Fellows to change their preceptors during the same time period. During the same time frame, according to Lim, FDA management concealed his findings from a study relating to "patient safety risk signals." SAC ¶ 66.

On May 20, 2009, Lim applied for a "Flexible Workplace Arrangement Plan," a temporary accommodation that allows an employee to work from home, in order to allow his wife to travel to Korea to be with Lim's terminally ill father. *Id.* ¶ 48. The FDA denied this request but granted FWAP requests by two white employees with unspecified circumstances.

On June 5, 2009, the FDA terminated Lim's employment based on both his conduct and his performance. Specifically, FDA cited the March 16, 2009 "Internal Memorandum" as "unprofessional, disrespectful," and a waste of "valuable agency resources." Termination Memo. at 2, J.R. 1252. Lim refused to sign the termination memorandum. Instead, Lim wrote a statement below the signature line stating that he intended to file a lawsuit alleging "[d]iscrimination based on national origin," "retaliation," and "negligence." SAC ¶ 52; *see also* Termination Mem. at 3, J.R. 1253.

Following Lim's termination, he was not paid for 124 hours of unused vacation time and was instead charged for 68.63 hours of "negative work hours." SAC ¶ 54. According to Lim, the FDA altered his leave and earnings statement, created various false financial accounts showing that he owed more than $20,000, and over the next four years referred these accounts to debt collection agencies and the Internal Revenue Service ("IRS").

4

The FDA also falsely characterized Lim's departure as voluntary, thus preventing him from obtaining unemployment benefits. In September 2009, however, the Maryland Department of Labor, Licensing and Regulation ("DLLR") found that Lim was entitled to unemployment benefits.

According to Lim, between 2009 and 2015, FDA implemented various programs based on his previously rejected research proposals.

## II.    Procedural History

On September 16, 2009, Lim filed a formal complaint with the FDA Office of Equal Employment Opportunity and Diversity Management ("EEO Office"). On the complaint form, Lim asserted claims of race, color, and national origin discrimination and retaliation. The issues he identified were non-sexual harassment, termination, performance evaluations, assignment of duties, duty hours, reassignment, reinstatement, time and attendance, and terms and conditions of employment. On September 22, 2009 and October 16, 2009, Lim amended his complaint to add two retaliation claims, specifically that both FDA's characterization of his departure as voluntary, and its claims at a DLLR hearing that he had sent condescending emails, lacked an understanding of scientific language, and had showed no signs of improvement, were forms of retaliation for filing complaints.

On January 29, 2010, the EEO Office informed Lim that it had accepted for investigation six discrete claims from his complaint and amendments, consisting of Lim's claims that (1) he was not allowed to change his preceptor; (2) his research proposals were rejected; (3) FDA did not consider his FWAP application; (4) he was inappropriately terminated; (5) his supervisors inappropriately criticized his scientific knowledge; and (6) FDA management concealed his findings related to patient safety information.

5

The EEO Office conducted an investigation into these claims and issued a report on May 4, 2010. Lim elected to proceed to a hearing before an EEOC Administrative Judge ("AJ"), which was held May 4-5, 2011. On April 8, 2013, the AJ issued a decision denying each of Lim's claims. HHS issued its final decision dismissing Lim's complaint on April 29, 2013, which Lim appealed to the EEOC Office of Federal Operations. That office affirmed HHS's decision on August 6, 2015. On November 9, 2015, Lim filed the instant case in the United States District Court for the Western District of Virginia. On October 6, 2016, following a successful Motion to Transfer Venue filed by Defendants, the case was transferred to this Court.

On September 27, 2010, during the processing of his first EEO complaint, Lim filed a second formal complaint with the EEO Office alleging post-termination retaliation. Specifically, Lim alleged that on August 2, 2010, the Chief of the HHS Debt Services Section referred Lim to a debt collection agency, which resulted in Lim receiving a collection letter in retaliation for his prior complaints. The EEO Office dismissed the complaint pursuant to 29 C.F.R. § 1614.107(a)(3) on the grounds that the AJ had not accepted these claims for consideration in the proceedings on the first complaint.

On July 7, 2011, Lim filed a third formal complaint with the EEO Office, alleging that he was retaliated against for his prior complaints when he was reported to the IRS and a debt collection agency. This complaint was dismissed on October 4, 2011 for failing to state a claim that affected the terms, conditions, or privileges of Lim's employment. Lim also claims that he filed a fourth formal complaint on January 9, 2013 alleging retaliation after he "received two documents from the U.S. Treasury stating 'Debt Information,'" but he has not provided copies of the complaint or decision. SAC ¶ 68.

## DISCUSSION

In their Motion to Dismiss the First Amended Complaint, Defendants argue that (1) because the Secretary of HHS is the only proper defendant in a Title VII action, all claims against the other Defendants must be dismissed; (2) Lim fails to state a plausible Title VII hostile work environment claim; (3) Lim's discriminatory treatment claims should be dismissed because he has not asserted any adverse employment actions within the meaning of Title VII, with the exception of discriminatory termination, for which he has failed to state a plausible claim; (4) Lim's pre-termination retaliation claims should be dismissed because Lim did not engage in protected activity until he was terminated; and (5) Lim failed to exhaust administrative remedies relating to his post-termination retaliation claims and some of his discrimination claims.

Lim filed a memorandum in opposition to the Motion as well as a Motion for Leave to File a Second Amended Complaint. The proposed Second Amended Complaint does not add new claims or defendants, but "accounts for the factual findings that have occurred since the [First Amended Complaint] was filed." Mot. Amend at 1, ECF No. 68. Defendants have opposed the Motion to Amend, arguing that granting Lim a third opportunity to amend the complaint is excessive and that amendment is otherwise futile for the same reasons articulated in the Motion to Dismiss.

## I.    Motion to Amend

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written

consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave when justice so requires." *Id.*

Although Lim claims that the proposed Second Amended Complaint is intended to account for factual developments since the filing of the First Amended Complaint on July 10, 2017, a review of Lim's proposal shows that all of the additional facts occurred prior to 2013 and therefore could have been included in either the original Complaint or the First Amended Complaint. Many of Lim's changes appear to be stylistic edits, such as changing "asked" to "threatened," SAC ¶ 25, or adding conclusory statements of law, such as "Lim exhausted administrative remedies," *id.* ¶¶ 39, 45, 57, 67, 68. The most substantive additions are Lim's details regarding post-termination retaliation, his filing of formal complaints with the EEO Office, and his assertion that he was forced to conceal safety information. Lim also expands on his claim that his supervisors inappropriately criticized his scientific knowledge.

Lim has not put forth a compelling justification for failing to include these facts in the First Amended Complaint. However, the additional facts asserted in the Second Amended Complaint do not affect the Court's analysis of Lim's claims. Defendants' arguments in their Motion to Dismiss are equally applicable to the Second Amended Complaint, and Defendants were explicitly provided the opportunity to supplement, in their memorandum in opposition to the Motion to Amend, their argument for dismissal by specifically addressing how even with the additional facts in the proposed Second Amended Complaint, Lim's claims should be dismissed. The Court therefore finds that Defendants are not prejudiced by the Second Amended Complaint. Given Lim's *pro se* status in this case, the Motion to Amend will be granted. Lim will not be granted any additional opportunities to amend absent exceptional circumstances.

## II.   Motion to Dismiss

### A.   Legal Standards

To the extent that Defendants seek dismissal of Lim's discrimination and retaliation claims based on a failure to exhaust administrative remedies, the Motion should be construed as a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Jones v. Calvert Group, Ltd*, 551 F.3d 297, 300-01 (4th Cir. 2009).[3] On a Rule 12(b)(1) motion, the plaintiff bears the burden of proving that subject matter jurisdiction exists. See *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). Because this is a factual dispute over whether such exhaustion has occurred, the Court may consider external materials in resolving this issue. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

The Defendants' remaining arguments are construed as seeking dismissal for failure to state a claim under Rule 12(b)(6). In deciding such a motion, the Court must determine whether the complaint alleges facts sufficient to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a plaintiff in a discrimination case need not always plead a *prima facie* case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to state a plausible claim, *see*

---

[3]   Whether failure to exhaust administrative remedies is always a subject matter jurisdiction question has not been definitively established. The United States Supreme Court has noted that "[o]n the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous," *Arbaugh* v. *Y & H Corporation,* 546 U.S. 500, 511 (2006), and has "cautioned ... against profligate use of the term ... 'jurisdictional.'" *Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers,* 558 U.S. 67, 82 (2009). Notably, the United States Court of Appeals for the Fourth Circuit has held that the question of whether an administrative claim was timely filed with the EEOC is *not* jurisdictional. *Edelman* v. *Lynchburg College,* 300 F.3d 400, 404 (4th Cir. 2002).

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15 (2002), the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In making such a determination, the Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## B.    Proper Defendants

Defendants first argue that the only proper Defendant is the Secretary of HHS. They are correct. Under Title VII, civil actions by current or former federal employees must be brought against the head of the federal department that employed the plaintiff, not against component agencies or individual supervisors. *See* 42 U.S.C. § 2000e-16(c) ("[A]n employee . . . may file a civil action" in which "the head of the department, agency, or unit, as appropriate, shall be the defendant."); *Gardner v. Gartman*, 880 F.2d 797, 799 (4th Cir. 1989) ("[T]he head of the department for which the plaintiff works is the proper defendant in a sex or race discrimination suit."). Therefore, the Court will grant the Motion to Dismiss as to all Defendants except the Secretary.

## C.    Hostile Work Environment

In Count I, Lim alleges that Defendants subjected him to a hostile work environment in violation of Title VII. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the

harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baquir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[C]allous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), in contrast, do not rise to the level of actionable harassment.

Here, Lim's hostile work environment claim is based on the alleged denial of his requests to change his preceptor, the setting of "bogus deadline[s]" for submitting project proposals, plagiarism of his work, derogatory statements about his competence and professionalism, and "treating him as a jerk." SAC ¶¶ 72-78. These and the other allegations in the Second Amended Complaint do not describe harassment that is severe or pervasive enough to establish a hostile work environment. Lim alleges no physically threatening conduct, abusive communication, or even raised voices in his description of each of the above incidents. The alleged conduct consists primarily of denials of requests to supervisors, negative evaluations of his job performance, and emails from colleagues criticizing Lim for being insensitive and exclusionary. Courts have declined to find a hostile work environment based on workplace conduct far more severe than alleged here. *See, e.g., Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013)

11

(stating that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)).

Moreover, Lim offers virtually no facts that suggest that any of these actions were motivated by his membership in a protected class. The emails he has attached as exhibits to both his First and Second Amended Complaints, whether by FDA management, his preceptor, or other Fellows, make no mention of his race, color, or national origin. The only allegation that Lim's national origin was referenced is his claim that Sackner-Bernstein told Lim on April 13, 2009 that he "can't work with Korean like you." SAC ¶ 44. A single incident of abusive conduct toward an employee, particularly by a supervisor, can establish a hostile work environment if the offensive action was egregiously severe. *See, e.g., Boyer-Liberto*, 786 F.3d at 278, 280 ("[A] reasonable jury could find that [the supervisor's] two uses of the "porch monkey" epithet ... were severe enough to engender a hostile work environment."). Unlike in *Boyer-Liberto*, however, Sackner-Bernstein's lone comment did not consist of an explicit, odious racial slur or other comparably severe conduct that would support the finding that the comment, standing alone, established a hostile work environment based on national origin. *See Boyer-Liberto,* 786 F.3d at 280. Particularly where most of the alleged offensive conduct was not perpetrated by Sackner-Bernstein, the Court finds that Lim has not stated a plausible claim that the conduct, even if sufficient to constitute a hostile work environment, was based Lim's race or national origin. Accordingly, the Court grants Defendants' Motion to Dismiss as to Count I.

## D.    Discriminatory Treatment

In Count II, Lim alleges that Defendants impermissibly discriminated against him on account of race, color, or national origin in violation of Title VII by (1) denying him "equal employment opportunities (e.g. employment terms, conditions, or privileges)" and (2) terminating his employment. SAC ¶ 79-82.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To evaluate Title VII claims in the absence of convincing direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). The burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Id.* Upon such a showing, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination." *Id.* at 558–59 (quoting *Hill*, 354 F.3d at 285).

To establish a *prima facie* claim for race, color, or national origin discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class, (2) the plaintiff's satisfactory job performance, (3) that the plaintiff was subjected to an adverse employment action, and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.*, 375 F.3d 288,

295 (4th Cir. 2004). When the claim is discriminatory termination, the elements are altered slightly. A plaintiff must then present facts demonstrating: (1) the plaintiff's membership in a protected class, (2) that the plaintiff was terminated, (3) that at the time of the termination, the plaintiff was performing at a level that met the employer's legitimate expectations, and (4) that the position was filled by a similarly qualified applicant from outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Although Lim does not need to allege facts sufficient to establish a *prima facie* case under Title VII on a motion to dismiss, he nevertheless must plead facts sufficient to support a reasonable inference that an alleged adverse employment action was motivated by bias or discrimination. *See McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584-85 (4th Cir. 2015). There is no dispute that Lim, an Asian American of Korean descent, is a member of a protected class.

In asserting disparate treatment based on terms, conditions, and privileges of employment, Lim asserts a variety of allegedly discriminatory actions, including that FDA officials required him to develop his own research proposal without guidance, issued a memorandum reminding him of professional conduct standards, prevented him from attending required classes, rejected the research proposals that he developed, ignored his request to submit a research proposal without his preceptor's signature, and concealed his research findings. However, he identifies only two situations in which other Fellows outside of his protected class allegedly received more favorable treatment. First, Lim contends that his repeated requests to change preceptors were denied, but four white Fellows were allowed to do so. Second, he claims that his request for an FWAP was denied by FDA officials while similar requests were granted for two white female Fellows.

14

These incidents do not support a disparate treatment claim under Title VII because they are not adverse employment actions. "An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). The denial of Lim's request to change his preceptor had no effect on his pay, benefits, job title, or responsibilities and thus is not an adverse employment action that could support a claim of discrimination based on disparate treatment. *See, e.g., Kortan v. California*, 5 F. Supp. 2d 843, 852-53 (C.D. Cal. 1998) (holding, in the context of a retaliation claim, that the denial of a request to change supervisors was not an adverse employment action), *aff'd sub nom, Kortan v. Cal. Youth Auth.* 217 F.3d 1104 (9th Cir. 2000). Likewise, the denial of Lim's FWAP did not affect his pay or benefits, downgrade his title, or reduce his job responsibilities. *See Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007) (holding, in the context of a retaliation claim, that denial of an alternative work schedule was not an adverse employment action); *see also Burlington N. & Santa Fe. Ry. V. White*, 548 U.S. 53, 67 (2006) (noting that the standard for conduct to be an adverse employment action is lower for a retaliation claim than for a discrimination claim).

Lim's termination undoubtedly qualifies as an adverse employment action for the purposes of a Title VII claim, but Lim has not provided sufficient allegations to support a plausible claim of discriminatory termination. Specifically, he has not alleged that he was replaced by a new Fellow from outside his protected class. According to Lim, HHS "left [the]

position open," such that there is no allegation that it was filled by someone who was not Asian American or of Korean descent. SAC ¶ 63. Moreover, Lim does not claim that other Fellows from outside the protected class had submitted documents such as the Internal Memorandum and had difficulty submitting a satisfactory research proposal, yet were not terminated.

The only reference in the Second Amended Complaint to Lim's race or national origin is the allegation that Sackner-Bernstein told him on April 13, 2009, "I can't work with Korean like you." SAC ¶ 44. However, Sackner-Bernstein did not have the authority to terminate Lim. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (holding that an employer is not liable when "an improperly motivated person . . . merely influences the decision"). In limited circumstances, discriminatory intent can be imputed to the formal decisionmaker "when that official has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (applying this principle to an alleged violation of the Uniformed Services Employment and Reemployment Rights Act, which "is very similar to Title VII"); *see also e.g., Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294-96 (10th Cir. 2013) (applying *Staub* to a Title VII national origin claim). Under this cat's paw theory of liability, evidence that a supervisor who was not the formal decisionmaker "perform[ed] an act motivated by [discriminatory] animus that [was] *intended* by the supervisor to cause an adverse employment action" could support a finding of discrimination "if that act [was] a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422 & n.3 (footnote omitted). The supervisor, however, cannot merely have "substantial influence on the ultimate decision" or play a "significant" role in the decision; rather, a supervisor's discriminatory animus may support liability only if the supervisor was, in effect, "principally responsible for, or the actual

decisionmaker behind, the action," such as when the formal decisionmaker simply rubber-stamped the supervisor's recommendation. *See Hill*, 354 F.3d at 291; *Ousley v. McDonald*, 648 F. App'x 346, 348-49 (4th Cir. 2016) (considering only the motivations of the formal decisionmaker when the individual alleged to have a discriminatory motive "merely acted as a consultant" on the final employment decision).

Here, there is no allegation that Sackner-Bernstein was either the formal decisionmaker or the actual decisionmaker for Lim's termination. Rather, the termination memorandum was authored by FDA Assistant Commissioner for Management Kimberly Holden. Sackner-Bernstein's correspondence reveals that although he was asked to and did provide input on Lim's professional performance and workplace behavior, he made no mention of Lim's race or national origin and did not specifically recommend Lim's termination. *See* SAC ¶ 37 (quoting an email from Sackner-Bernstein to Wilkicki and Dickey where Sackner-Bernstein states "[i]f *you were to decide* it best for David to leave, I would not disagree"). Moreover, Sackner-Bernstein's input focused on Lim's inability to complete a research proposal on time, while Holden's termination memorandum emphasized Lim's submission of the Internal Memorandum and inability to work effectively with his peers. *Compare* Sackner-Bernstein Email, J.R. 1235-36 *with* Termination Mem., J.R. 1251-53. Thus, even accepting as true Lim's assertion that Sackner-Bernstein had once mentioned his national origin, it is clear that Holden did not simply rubber-stamp a termination decision effectively made by Sackner-Bernstein. Because Lim has not alleged facts that could reasonably support the claim that his termination was based on race, color, or national origin, the Court will grant Defendants' Motion to Dismiss as to this claim. *See Ramos v. Molina Healthcare, Inc.*, 630 F. App'x 173, 178 (4th Cir. 2015) (affirming the dismissal of a Title VII discriminatory termination claim where, "[a]part from some conclusory allegations of

causation," the plaintiff "merely alleged that [his supervisor] once made a derogatory comment about Hispanics and that [his] supervisors generally disliked Hispanics").

### E. Retaliation

In Counts III and IV, Lim alleges that he was subjected to various retaliatory actions for opposing discriminatory practices within the FDA Commissioner's Fellows Program, including acts taken before his termination, the termination itself, and acts taken after his termination. Specifically, Lim alleges that the issuance of the March 5, 2009 memorandum on professional conduct; the denial of his requests to change preceptors; the rejection of his research proposals; Sackner-Bernstein's statement that he could not "work with Korean like" Lim, SAC ¶ 44; his termination as an FDA Commissioner's Fellow; the denial of a post-termination payment to him for accrued leave; and the creation of allegedly false accounts in his name that were referred to debt collection agencies were all undertaken by HHS officials in retaliation for "exercising his federally protected rights." SAC ¶ 88.

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. Employment practices made unlawful by Title VII are those that discriminate against employees on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2 (delineating unlawful employment practices under Title VII). To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) "there was a causal link between the two events." *Boyer-Liberto*, 786 F.3d at 281.

18

### 1. Pre-Termination and Termination

Defendants argue that Lim's retaliation claims arising from his termination and actions taken prior to his termination cannot support a cause of action for retaliation because Lim did not engage in any protected activity before he filed his EEO complaint on September 16, 2009. In response, Lim argues that he engaged in protected, oppositional activity to discriminatory conduct on three separate occasions: (1) by filing the "Internal Memorandum" on March 16, 2009; (2) by requesting to change his preceptor; and (3) by refusing to sign his termination memorandum and instead stating that he intended to file a lawsuit based on discrimination and retaliation.

Courts take an "expansive view of what constitutes oppositional conduct." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). It "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). To qualify as protected activity, the employment practices opposed may be either "actually unlawful under Title VII" or reasonably believed by the employee to be unlawful. *Boyer-Liberto*, 786 F.3d at 282 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397 (4th Cir. 2005)). However, to qualify as protected activity, an employee's complaints must still communicate "a belief that the employer has engaged in . . . a form of employment discrimination" based on a protected class. *Crawford v. Metrop. Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009); *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 685–86 (4th Cir. 2009) (emphasizing, when applying Title VII retaliation analysis to an Age Discrimination in Employment Act claim, that "it is fundamental" that a plaintiff must have engaged "in activities opposing discrimination"). Complaints about management activities

that would not constitute unlawful discrimination do not count as protected activity. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216–17 (4th Cir. 2002) (finding no Americans with Disabilities Act retaliation claim because the plaintiff could not reasonably believe that the conduct she had opposed violated the ADA, even though the opposed conduct could have violated state medical malpractice law); *Bowman v. Balt. City Bd. of Sch. Commr's*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) ("General complaints of unfair treatment are not protected activity.").

Here, Lim's pre-termination activities did not communicate opposition to an alleged discriminatory practice and are thus not protected activities within the meaning of Title VII. There is no mention of Lim's race, color, or national origin within the 29 pages of the "Internal Memorandum." *See* Internal Mem., J.R. 1205-1233. Although Lim now labels his preceptor, Sackner-Bernstein, as an intolerant "Jewish extremist" in support of his claim that his requests to change preceptors constituted attempts to oppose discrimination, Lim does not allege in the Second Amended Complaint or elsewhere that he communicated his views about Sackner-Bernstein's motivations to agency officials when making his requests. Opp'n Mot. Dismiss at 3, ECF No. 61. Finally, the statement written by Lim on his termination memorandum announcing his intention to file a discrimination complaint cannot constitute protected activity underlying a claim of retaliatory termination because the FDA's decision to terminate Lim had already taken place, and had been communicated to him, before Lim wrote that statement. Accordingly, the Court dismisses Lim's claims that his termination or any pre-termination actions constituted unlawful retaliation.

### 2. Post-Termination

Defendants argue that Lim's post-termination retaliation claims, in which he asserts that FDA retaliated against him by providing misleading information to the DLLR and by falsifying debts and referring them to collection agencies, should be dismissed because he failed to exhaust administrative remedies.

Lim filed his first EEO complaint on September 16, 2009, in which he alleged discriminatory treatment and termination, hostile work environment, and retaliation for pre-termination conduct. He then amended his EEO complaint on September 22 and October 16, 2009 to include claims of retaliation based on the FDA's representations to the DLLA allegedly aimed at causing his post-termination claim for unemployment benefits to be denied. On August 9, 2010, Lim contacted an EEO counselor to assert a claim of retaliation based on FDA's August 2, 2010 referral of Lim's account to a debt collection agency. Lim filed a second formal EEO complaint on this issue on September 27, 2010, which was denied on January 5, 2011 because the AJ had declined to accept the claim in the adjudication of the first EEO complaint. On May 10, 2011, Lim contacted an EEO counselor to report allegedly retaliatory activity consisting of the referral of three financial accounts in his name to the IRS and a debt collection agency. Lim filed a formal complaint on this issue on July 7, 2011. The complaint was denied on October 4, 2011, on the grounds that it was an identical matter to one of his earlier EEO complaints. With the Final Agency Decisions on the second and third EEO complaints, Lim was notified that he could file an appeal to the EEOC within 30 days of the Final Agency Decision, and that he must file a civil action within 90 days of the Final Agency Decision if he did not file an appeal or within 90 days of the EEOC's appeal decision. Lim did not appeal those decisions.

Defendants argue that where Lim failed to file appeals of the second and third EEO complaints or file a federal lawsuit within 90 days of the Final Agency Decision, he did not exhaust administrative remedies. They also claim that he did not pursue any part of the administrative process, beginning with contacting an EEO counselor, for any other post-retaliation claims, including his allegations that he was retaliated against through the fabrication of negative leave balances and alleged false statements to the DLLA that his termination was voluntary. The Court concludes that Lim's claim that FDA's statements to the DLLR constituted post-termination retaliation may proceed, because that claim was added to the September 16, 2009 EEO complaint by amendment and was thus exhausted.

Unlike a discrimination claim, a retaliation claim can be alleged for the first time in federal court if it alleges retaliation for the filing of the EEOC charge or EEO complaint itself. *Jones*, 551 F.3d at 302; *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (holding that an Army employee could bring a retaliation claim for the first time in federal court when the allegation was that the Army retaliated against her for filing an EEOC charge). However, a retaliation claim need not be exhausted only if it relates to alleged retaliation for the filing of the EEOC charge or EEO complaint underlying the federal complaint. *See Jones*, 551 F.3d at 304 (finding that a retaliation claim did not need to be exhausted where it could be construed as relating to retaliation for the filing of a second EEOC charge that gave rise to the federal complaint). To the extent that a retaliation claim relates to an earlier EEOC charge or protected activity, the Court may not consider it absent exhaustion. *See id.*; *see also Tonkin v. Shadow Mgmt., Inc.*, 605 F. App'x 194, 194 (4th Cir. 2015) (finding a failure to exhaust a retaliation claim where the plaintiff "had knowledge of the factual basis for her retaliation claim before she filed her charge with the EEOC").

Thus, Lim's post-termination retaliation claims need not be exhausted to the extent that they allege that FDA took certain actions in retaliation for the filing of his September 16, 2009 EEO complaint. The fact that Lim filed additional EEO complaints for some of his post-retaliation claims but did not complete the administrative process does not alter this conclusion, particularly where the EEO complaints relating to post-termination retaliation appear to have been summarily dismissed because the issues were already being addressed in the first EEO complaint. *See Churchill v. Prince George's Cty. Pub. Schs.*, No. PWG-17-0980, 2017 WL 5970718, at *7-8 (D. Md. Dec. 1, 2017) (stating that "a plaintiff asserting a Title VII claim of retaliation for filing a previous EEOC charge . . . may raise the retaliation claim for the first time in federal court," even though the plaintiff filed a later EEOC charge without raising the retaliation claim); *Tripp v. Cty. of Gates*, No. 16-cv-00023-FL, 2017 WL 3528653, at *5 (E.D.N.C. Aug 16, 2017) (noting, in a case involving two EEOC charges, that "if plaintiff's first EEOC charge was properly before this court, plaintiff's related retaliation claim would also be properly before this court").

Lim's factual assertions are sufficient to state a plausible claim of post-termination retaliation for the filing of his first EEO complaint. On the first prong of a *prima facie* retaliation claim, Lim engaged in protected activity by participating in post-termination EEO counseling between June 11, 2009 and September 8, 2009, and by filing a formal EEO complaint on September 16, 2009. *See Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (holding that contact with an EEO counselor was "protected activity"). Lim has also satisfied the second prong. Unlike a discrimination claim, an "adverse employment action" for the purposes of a Title VII retaliation claim is any action which "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.

Accepting as true Lim's allegation that FDA falsely declined to pay him for his unused vacation time and falsely created debts amounting to $20,000 against him, such actions would be sufficient to dissuade a reasonable worker from pursuing a discrimination claim following their termination. *Cf. Aviles v. Cornell Forge Co.*, 183 F.3d 598, 605-06 (7th Cir. 1999) (holding that an employer's filing of a false police report was an "adverse employment action" for the purposes of a Title VII retaliation claim).

Finally, Lim has pleaded a causal link between his protected activity and the retaliatory actions. Lim claims that FDA altered his civilian leave and earnings statement of August 29, 2009, approximately 12 weeks after Lim informed HHS that he intended to file a lawsuit against the agency and during his informal pre-complaint counseling with the EEO Office. Lim alleges that the debt collection referrals began in August 2010, which was almost a year after the filing of his first EEO complaint in September 2009, but was three months after the completion of the EEO investigation and during discovery prior to the May 4-5, 2011 EEOC hearing. SAC ¶ 55; *see also* 29 C.F.R. § 1614.109(d) (2017) (allowing parties to seek discovery prior to a hearing before an EEOC AJ). Lim asserts that the referrals were made by Dickey who, as a Human Resources Specialist, was aware of Lim's EEOC actions. Moreover, it appears that Lim's only interaction with the FDA following his termination was through the EEO process, either through the filing of complaints or participation in the adjudication of his complaints. On a motion to dismiss, the temporal proximity with Lim's ongoing engagement in the EEO process is sufficient to state plausibly that the debt collection referrals, by someone with knowledge of Lim's EEO complaint, were caused by a retaliatory motive. *See, e.g., Waag v. Sotera Defense Solutions, Inc.*, 857 F.3d 179, 192 (4th Cir. 2017); *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (holding that, although it was "a very close question," a plaintiff established a *prima facie* case of

24

retaliation despite a "nine to ten month" gap between protected activity and the adverse decision); *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case"). Particularly where the retaliation provision of Title VII protects those who "participated in any manner in an investigation, proceeding, or hearing," 42 U.S.C. § 2000e-3(a), the Court denies the Motion to Dismiss as to Lim's post-termination retaliation claims.

This decision extends to the alleged alteration of Lim's leave and earnings statement. Although this alleged retaliation occurred prior to the September 16, 2009 EEO Complaint, it is not clear from the pleadings when Lim learned of the alteration, leaving open the possibility that Lim learned of the alleged changes to his leave statement after he submitted the September 16, 2009 EEO complaint. Since it is not clear that Lim "had knowledge of the factual basis for [his] retaliation claim before [he] filed [his] charge with the EEOC," this claim may be raised for the first time in a judicial complaint. *See Tonkin*, 605 F. App'x at 194.

**CONCLUSION**

For the foregoing reasons, Lim's Motion for Leave to File a Second Amended Complaint is GRANTED, and Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Defendants' Motion is GRANTED as to Counts I, II, and III. The Motion is DENIED with respect to Count IV. Count IV is limited to claims of post-termination retaliation for the filing of the September 16, 2009 EEO Complaint or claims of which Lim was not aware when the first EEO complaint was filed. All claims against Defendants other than the Secretary of HHS are DISMISSED.

Date: April 19, 2018

THEODORE D. CHUANG
United States District Judge